**Wesley G. SOULE, Plaintiff,**

v.

**RETIREMENT INCOME PLAN FOR SALARIED EMPLOYEES OF REXHAM CORPORATION and Rexham Corporation, Defendants.**

**No. C–C–88–454–P.**

United States District Court,
W.D. North Carolina,
Charlotte Division.

July 25, 1989.

A. Ward McKeithen and David C. Wright, III, Robinson Bradshaw & Hinson, P.A., Charlotte, N.C., for plaintiff.

George V. Hanna, III and Hayden J. Silver, III, Moore & Van Allen, Charlotte, N.C., for defendants.

## MEMORANDUM OF DECISION

ROBERT D. POTTER, Chief Judge.

This was an action by Plaintiff alleging that the failure to include sums received by Plaintiff from stock options in calculating Plaintiff's retirement benefits was an abuse of discretion and contrary to the provisions of the Retirement Income Plan for Salaried Employees of Rexham Corporation (the "Plan"). Whether tested by the *de novo* standard or "the abuse of discretion standard," the Court finds for the Plaintiff.

## FINDINGS OF FACT [1]

(1) This action was brought pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.*, and specifically under 29 U.S.C. § 1132(a)(1)(B).

(2) Plaintiff, Wesley G. Soule ("Soule"), is a citizen of the United States who resides in Mecklenburg County, North Carolina.

(3) Defendant, Rexham Corporation ("Rexham") is a Delaware corporation with

1. "DX" refers to Defendants' Exhibit. "PX" refers to Plaintiff's Exhibit. "Depo." refers to Deposition.

"Tr." refers to Transcript. "F.F." refers to Findings of Fact.

its principal executive offices located in Mecklenburg County, North Carolina.

(4) Defendant Retirement Income Plan for Salaried Employees of Rexham Corporation ("the Plan") is a qualified pension plan under the provisions of the Internal Revenue Code.

(5) Soule is a former employee of Rexham. He retired from Rexham effective May 16, 1988, having been employed by Rexham and its predecessor for over 30 years. Before his retirement, Soule occupied the position of Treasurer, which he held for 20 years. He was a member of the Qualified Plans Committee and its Chairman for 5 to 6 years.

(6) Rexham was a public company prior to its sale in late 1987 to Bowater Industries plc ("Bowater"), a British Company. Rexham's stock was traded on the New York Stock Exchange.

(7) While employed by Rexham, Soule became a vested participant in the Plan. The Plan pays retirement benefits to its participants based upon their length of service and their "Final Average Earnings." "Final Average Earnings" consists of the participant's average "Earnings" during the five consecutive years (in the ten years preceding retirement) in which the participant earned the most.

(8) Rexham expanded the Plan's definition of earnings on February 27, 1987 when the full Board of Directors adopted the 16th Amendment to the Plan, and it is this new, expanded, definition that is at issue in this litigation. The precise issue is whether the new definition of Earnings includes the stock compensation that Soule received during his last five years with Rexham.

(9) The February 1987 change in the definition of Earnings in the Plan was adopted by Rexham's Board of Directors as part of the "16th Amendment" to the Plan. This Amendment was made by Rexham's Board after an announced hostile takeover of Rexham by Nortek, Inc.

(10) The 16th Amendment to the Plan was first acted upon by the Compensation Committee of Rexham's Board of Directors on February 26, 1987. At that meeting was William N. Kravitz, a lawyer with the New York law firm of Skadden, Arps, Slate, Meagher & Flom, which had been retained by Rexham to assist in the takeover defense (DX 17).

(11) The Compensation Committee recommended the adoption of the 16th Amendment by the full Board of Directors. The Board met the following day, February 27, 1987 (DX 18). At the February 27th meeting, the Board adopted the 16th Amendment to the Plan. The minutes of that meeting reflect no discussion by the Board concerning the 16th Amendment to the Plan nor any discussion of the meaning of or intent behind the expansion in the Plan's earnings definition (DX 18, pp. 5–6). Stock options were a principal component of three of the new plans added to the Earnings definition. Bill J. Reid, who was largely responsible for communicating the change in the definition to the draftsman, Kenneth L. MacCardle, testified that in his opinion the expansion of the Earnings definition was a "poison pill," a defensive measure designed to discourage takeover attempts (Reid Depo., pp. 65–66; Tr. 249).

(12) At the February 27th meeting, the Board adopted other "poison pills." One such defensive measure was the authorization to enter into new employment contracts with Rexham's five top executives (DX 18). These contracts specified that any termination without cause would entitle these executives to approximately $9 million in the aggregate (Reid Depo. p. 67; PX 9, footnote 2, pp. 5–6).

(13) Another of these "poison pills" was contained in the 16th Amendment to the Plan. In that Amendment the Board not only changed the definition of "Earnings," but provided that following a change in control, Rexham effectively could not appropriate any surplus assets in the Plan. The Amendment also prohibited certain changes in the Plan in the event of a takeover. Included in the prohibition against changes was any attempt to change the items includable in Plan Earnings (PX 10).

(14) Prior to the adoption of the 16th Amendment, Plan Earnings included the participant's salary, overtime pay, sales

commissions and bonuses made under two incentive plans. The definition in full read:

"Earnings" shall mean the Participant's basic rate of salary on any salary action date (each January 1 in each Plan Year and any other date in such Plan Year upon which base salary is increased or decreased) plus any overtime pay, sales commissions and bonus payments made under the Employer's Officers' Incentive Compensation Plan and Managers' Incentive Compensation Plan received by the Participant during the preceding Plan Year.

(PX 11).

(15) The Employees' Officers' Incentive Compensation Plan and Managers' Incentive Plan provided for cash bonus payments, which could be deferred at the election of the employee for a specified period of time. Neither of those Plans provided for the issuance of stock options or performance units by the Company (DX 2, 4).

(16) The 16th Amendment changed the definition of Earnings to include compensatory payments or distributions for additional, expressly identified deferred compensation plans, three of which have stock options as a component. The new definition reads:

"Earnings" shall mean the Participant's basic rate of salary on any salary action date (January 1 in each Plan Year and any other date in such Plan Year upon which base salary is increased or decreased) plus any overtime pay, sales commissions, bonuses *or other compensatory payments or distributions made under* the Employer's Officers' Incentive Compensation Plan, Managers' Incentive Compensation Plan, *Executive Incentive Compensation Plan, Executive Stock Option and Performance Share Compensation Plan, Executive Long–Term Incentive Plan and 1987 Long–Term Incentive Plan* received by the Participant during the preceding Plan Year.

(PX 10) (emphasis added)..

The emphasized words are those added to the definition of "Earnings" by the 16th Amendment.

(17) The three stock option plans added to the Plan's definition of Earnings in the 16th Amendment were: (1) the Executive Stock Option and Performance Share Compensation Plan; (2) the Executive Long Term Incentive Plan; and (3) the 1987 Long Term Incentive Plan ("the Stock Option Plans"). These three plans were essentially the same and were applicable at different times during Rexham's history. Each of the Stock Option Plans provided that the Company could reward its executives by giving them either or both of two forms of deferred compensation: performance units or shares and/or stock options (DX 7, 8, 9).

(18) Performance units provide for the Company to pay the employee compensation at a future date, the vesting date. At the vesting date, the employee receives a cash payment. The criteria for the cash payment vary in the incentive plans—some are based on stock price and others more upon increases in earnings per share and return on equity. The Executive Stock Option and Performance Share Plan permitted the Company to provide compensatory payments due the employee at the vesting date either in cash or in an equivalent value of Rexham common stock. The purpose of performance units, like stock options, was to reward executives for the contributions to the company's future success. Performance units are taxable as compensation at the time the employee receives their economic benefit, *i.e.,* when he receives the actual cash from the award (PX 9).

(19) The stock options available under the Stock Option Plans gave the Holder the right to purchase at the option price the Company's stock in the future. The option price is set at 100% of the fair market value at the time the option is granted. Stock options, like performance units, vest and become exercisable at a future date. If the stock price rises in value, the employee is able to buy the Company's stock at a bargain price. The employee realizes compensation based upon the difference between the price of the shares and the value of the shares at the time of exercise (PX 9).

(20) The Stock Option Plan provides for the issuance of both incentive and nonqual-

ified options. The income tax consequences of these two types of stock options differ. With respect to both types of options, no income tax consequences ensue at the time the options are granted. Nonqualified options are taxed when the employee exercises the option; he recognizes compensation income measured by the difference between the exercise price and the fair market value of the stock at the time of exercise. At that time, the corporation receives a comparable compensation tax deduction. Incentive stock options (ISO's) are taxed somewhat differently. At the time of exercise, the employee recognizes no compensation income. If he holds the stock for over a year, he recognizes capital gains income. If, however, he sells the stock before the one-year holding period expires, the employee is taxed precisely the same as with nonqualified options, recognizing compensation income represented by the difference between the exercise price and the fair market value at the time of issuance. When this occurs, it is called a disqualifying disposition, and the corporation receives a compensation deduction. Performance units are treated similarly. There is no tax on the issuance of the units, but only when the employee receives the economic benefit from the award at a future date (PX 9).

(21) Soule received both stock options and performance units under the Executive Stock Option and Performance Shares Compensation Plan and the Executive Long Term Incentive Plan. Soule exercised some of his options prior to November 1987, which resulted in taxable compensation to him and a compensation deduction for Rexham in the amount of $67,937.51. Soule received $28,312.51 in compensation after a disqualifying disposition of 1,925 ISO shares, which he had exercised on July 29, 1986. The parties have stipulated that these figures are accurate and should be included in Soule's pension earnings if he is correct in his contention that Earnings include stock option compensation (PX 28).

(22) Soule also claims that amounts he received from the cash-out of his remaining options in November 1987 should be included in his Earnings. This cash-out resulted from a friendly takeover of Rexham by Bowater.

(23) Bowater and Rexham reached an agreement on October 14, 1987 for Bowater to buy the company. On October 16, 1987, a subsidiary of Bowater made a tender offer to purchase all outstanding common shares of Rexham for the sum of $60.25 per share. Rexham supported the tender offer. As structured, Bowater's subsidiary, after purchasing Rexham's shares in the tender offer, was merged into Rexham, leaving Rexham as a wholly-owned subsidiary of Bowater. Pursuant to the terms of the Merger Agreement, any shares not sold in the tender offer were to be "cashed-out" for the tender offer price of $60.25 per share (DX 20, 21, 22).

(24) The Merger Agreement between Bowater and Rexham also affected outstanding stock options and performance units. With respect to stock options, the Merger Agreement required Rexham to take all steps necessary to "cash-out" existing stock options. The agreement did not specify how Rexham was required to do this. Article VII, ¶ 7.8 of the Merger Agreement provided only that:

> On or prior to the Effective Time, the Company shall take such actions as may be necessary such that, at the Effective Time, each stock option outstanding pursuant to the Stock Plans ("Option"), whether or not then exercisable, shall only entitle the holder thereof, upon surrender thereof, to receive, at or after the Effective Time, an amount in cash equal to the difference between the Merger Consideration and the exercise price per Share of such Option multiplied by the number of Shares previously subject to such Option.

(DX 20).

(25) A side letter agreed to by Bowater and Rexham at the time they entered into the Merger Agreement dealt with performance units. It modified the value of existing performance units, specifying that participants would be entitled to receive 100% of maximum value at the end of 1987, 66⅔% of maximum value at the end of

1988, and 33⅓% of such value for awards coming due at the end of 1989 (PX 12).

(26) Before deciding how to structure the cash-out, Rexham asked its accountants to determine how best to achieve favorable tax results. Rexham wanted to be sure to achieve a compensation tax deduction for the cash-out payments and desired to have the deduction in 1987 (PX 16).

(27) After receiving this advice, Rexham cashed-out the options by paying each option holder (including Soule) cash equal to the difference between the option price (the exercise price) and the sum of $60.25 per share, which is what the option holder would have realized had he or she sold their shares to Bowater. To document this transaction, on November 6, 1987, Rexham wrote a letter to each holder of a stock option granted under any of the Stock Option Plans which told each optionee of the arrangement and asked him to sign the letter agreement to receive a "cash settlement" for his options. The agreement specified that the option holder would receive the "same cash consideration" as if he or she exercised their options and then sold to Bowater (PX 15).

(28) All of the stock option holders, including Soule, signed the agreement and received cash, thereby eliminating the formality of first exercising the options and then selling them to Bowater at the $60.25 price as part of the tender offer. The "cash-out" merely saved one step in the process (PX 15).

(29) As of November 7, 1987, Soule held both incentive and nonqualified options representing 6,030 shares of stock. Soule signed the letter agreement on November 19, 1987. In December 1987, he received the sum of $252,314, which was the difference between the exercise price of the shares under option and the total amount he would have received for those shares upon a sale to Bowater. The parties have stipulated that this amount is also includable in Soule's pension earnings, if Soule is correct that stock option cash-out payments are includable in such earnings (PX 16).

(30) The parties have also stipulated that inclusion of the $252,314 cash-out payment and the $28,312.51 in compensation from stock option exercises would generate an additional annual retirement benefit to Soule of $22,596.21 under the 100% Contingent Annuitant Option he selected. The present value of this amount, the parties also have stipulated, is $214,666.18 (PX 28).

(31) In late 1987, Soule, then Chairman of the Qualified Plans Committee, first received a copy of the 16th Amendment of the Plan. Reading the language of the amendment, he concluded that the Plan clearly included in his pension earnings the amounts he received from the exercise of his stock options and from the December 1987 cash-out payments, since he held options issued to him under two of the stock option plans specifically referenced and added by the 16th Amendment to the definition of Earnings. He expressed this belief to Bill J. Reid, Rexham's Human Resources Director and a member of the Qualified Plans Committee, and to Maryanne Kruer, Rexham's benefits manager and a non-voting member of the Qualified Plans Committee. Both Reid and Kruer, after reading the Plan's language, stated that the Plan clearly included the stock option payments Soule received. Neither of these individuals has ever deviated from this view (Reid Depo. pp. 56–57; Tr. p. *200*, 246–247, 434).

(32) A similar view was expressed to Soule in early 1988 by Joseph Keniry, Soule's successor as Treasurer and as Chairman of the Qualified Plans Committee. Keniry, upon reading the Plan's language, after the November 1987 payments had been made, told Soule that he agreed that he thought Soule was right in thinking that the stock option payments should be included in his pensionable income. (Keniry Depo. pp. 39–40).

(33) Article XV of the Plan outlines the procedures for administration of the Plan. This Article, in pertinent part, provides as follows:

> 15.01 The Board of Directors [of Rexham] shall appoint a Committee [the Rexham Corporation Qualified Plans Committee] to administer the Plan.

. . . .

15.05 The Committee ... may appoint such accountants, legal counsel, actuaries, agents or other persons as it deems necessary or desirable in connection with the administration of the Plan and may delegate any such accountant, legal counsel, actuary, agent or other person such ministerial duties as it deems appropriate. Such accountants and counsel may, but need not, be accountants and counsel for the Employer. The Committee shall be entitled to rely conclusively upon, and shall be protected in any action taken by it in good faith in relying upon any opinion or reports which shall be furnished to it by any such accountants, legal counsel, actuary, agent or other person.

15.06 *The Committee shall ... interpret the Plan and shall determine all questions arising in the administration, interpretation and application of the Plan. Any such determination by the Committee shall be conclusive and binding on all persons* (emphasis added).

15.13 The Committee shall process claims for benefits under the Plan in the manner set forth in Section 19.09 [sic].

(PX 1, pp. 45–46).

(34) Section 19.*08* of the Plan contains the procedure for filing a claim for benefits under the Plan. This section, in pertinent part, provides as follows:

19.08.1 *Claims Procedure.* Each participant or Beneficiary entitled to a benefit under the Plan ("Claimant") shall file a claim therefor in writing on form or forms prescribed from time to time by the Committee (the "Claim").

19.08.2 The Claim shall be filed with the [Rexham] Employee ... having responsibility for personnel matters ... who shall forward the Claim to the Manager of the Human Resources Programs of the Employer.

19.08.3 The Manager of Human Resources Programs shall review the Claim ... and shall forward the Claim to the Committee not later than thirty (30) days after it is filed in the manner set forth in Section 19.08.2.

(19.08.4 The Committee shall either grant or deny (wholly or partially) the Claim within thirty (30) days after it is received. If ... the Claim has not been granted within sixty (60) days after it was filed in the manner set forth in Section 19.08.2, the Claim shall be deemed to have been denied and the Claimant may request a review of the denial of the Claim pursuant to the claim review procedure set forth in Section 19.08.6.

. . . .

19.08.6 Any Claimant whose Claim has been wholly or partially denied may himself or by a duly authorized representative within sixty (60) days after receipt of written notice of such denial:

(A) make a written application to the Committee for review of the denial of the claim,

. . . .

Within thirty (30) days after receipt of the written request of the Claimant for a review of the denial of his Claim, the Committee shall notify the Claimant in writing of its decision. . . .

(PX 1, pp. 60–61).

(35) Under Article XVI, Sec. 16.02, Rexham administered the Plan Fund. Under Sections 17.01 and 19.13 of the Plan, Rexham has "the sole authority to appoint and remove ... the Committee ... and to amend or terminate, in whole or in part, this Plan." Section 19.13 further provides that the "Committee shall have the sole responsibility for the administration of the Plan," that "each named Fiduciary may rely upon any such direction, information or action by another named Fiduciary as being proper under this Plan, and is not required under this Plan to inquire into the propriety of any such direction, information or action," and that "any person or group may serve in more than one Fiduciary capacity." (PX 1, p. 63).

(36) As a vested participant in the Plan, Plaintiff is entitled to receive a monthly benefit from the Plan based upon his benefit "earnings" as that term is defined in the Plan and interpreted by the Committee (Reid Depo. p. 16).

(37) Following Plaintiff's retirement, Maryanne Kruer, Rexham's Manager of Employee Benefits, by letter dated June 22, 1988, sent to Plaintiff the necessary forms that had to be completed and executed in order to process his retirement benefits. On these forms, Plaintiff was required to indicate his choice of the various retirement options that were permitted under the Plan. On these forms, Plaintiff's "average benefit earnings" were calculated as $105,244.77 and his "last full year earnings" were calculated as $150,534.35 (PX 26).

(38) On August 30, 1988, Soule executed and completed the required forms and by letter of the same date from his counsel returned these forms to Ms. Kruer. In this letter of August 30, 1988, Plaintiff also through counsel duly made a claim for additional benefits based on certain sums which he alleged should have been included in the definition of benefit "earnings" under the Plan, as defined in the 16th Amendment to the Plan (PX 27).

(39) In early 1988, Rexham's management had a series of meetings in which the issue was discussed and debated. Present at these meetings, which extended into June 1988, were the primary executives for Rexham: Scott Lea, President, Keith Kennedy, Vice President–Law, and Thomas McVerry, Vice President–Finance and Human Resources. Also attending some of the meetings were Reid and Kruer. Lea and Kennedy were not then nor had they ever been members of the Qualified Plans Committee ("the Committee") (Keniry Depo. pp. 28, 76; PX 21; Tr. 599).

(40) In February 1988, management instructed Kruer to determine the actuarial cost of including the cash-out payments in Earnings. Kruer compiled information about prospective retirement date and sent it to Johnson and Higgins, Rexham's benefits consultant and actuary. That firm indicated that it would cost approximately $725,000 over 10 years if the December 1987 payments were included in pension earnings for all participants in the Plan. (PX 19). Johnson and Higgins also indicated, that the Plan required the inclusion of these payments in pension earnings (PX 19).

(41) The cost figure was discussed at the management meetings held concerning this subject. Also discussed was the need to pursue the issue with Bowater before any decision was made. A conscious decision was made to solicit Bowater's views before deciding how to compute Soule's benefits, which were to begin on June 1, 1988 (Reid Depo. pp. 47–53; PX 23A; Tr. 528). Kennedy testified that one reason Lea took the issue to Bowater was "because of the significant financial effect" its resolution was going to have. (Tr. 600).

(42) In one of these meetings, Kennedy expressed his view that the Company would probably lose any lawsuit over the inclusion of stock option payments in Earnings. Kennedy prepared a memorandum, at Scott Lea's request, which summarized the issue requiring decision (PX 22). Kennedy's memorandum to Lea (PX 22) stated in part:

In February of 1987 the Compensation Committee of Rexham's Board of Directors became concerned *that retirement benefits no longer reflected the much greater emphasis placed on longer term incentive plans in the over-all compensation structure, nor did it reflect deferred cash payments of such compensation.* At their recommendation the Board adopted the Amendment to broaden the definition to include cash payments *made* under the longer term plans, including amounts previously deferred under all plans. The Board also did not intend to include the compensatory element *imputed* by the IRS to the optionees upon the exercise of stock options.

. . . .

The Sixteenth Amendment to the Salaried Plan was filed with the IRS and comprises an integral part of that qualified plan.

The "cash out" payments were made with respect to options granted under the last three identified plans (the "Stock Plans") in the revised definition. Although this type of payment was not

contemplated when the amendment was adopted, the specific reference to "compensatory payments or distributions made" under the Stock Plan presents a difficult argument that the payments at issue are not properly included in the definition of "Earnings".

Lea sent a copy of the memorandum to two members of Rexham's Compensation Committee and also to Bowater. In a memorandum to Bowater's president, David Lyon, Lea stated:

> Attached are Keith Kennedy's memos dated May 12, 1988 subject as above, and May 10, 1988 subject: "Rexham Corporation—Salaried Retirement Plan", and my May 13 memo to Messrs. Stookey and Iverson.
>
> After weighing the issues and discussing it with Messrs. Stookey and Iverson, I have concluded that the gain on the sale on stock options should not be included in the definition of benefit earnings for retirement purposes. It is important that it be recognized that there is a strong position to be taken in support of including it, and that their [sic] could be legal ramifications, however, I do not feel it was within the intent of Rexham's Compensation Committee nor within the normal scope of the definition.

(PX 23A).

Lea acknowledged, however, that there was no discussion of this specific issue at the February 1987 Board meeting, at which the 16th Amendment was proposed and adopted (Tr. 535).

(43) After sending his memo to Bowater, Lea spoke with David Lyon while in Great Britain. Lea had previously asked whether Bowater agreed with his views about the issue and Bowater, having been provided the cost figures and having a general aversion towards including any deferred compensation payments in Earnings, agreed (Reid Depo. p. 51; Tr. 529).

(44) Following this discussion with Lyon, Lea announced to Reid in June 1988 that he had made a decision and that the decision was not to include the stock option payments in pension earnings. Reid, in a memo to Kruer, written on June 13, 1988

said "I talked with [Lea]. Decision is to pay benefits *excluding* the Bowater payments." (PX 25). Kruer, based on this memo, computed Soule's benefits without giving him any earnings credit for his stock option compensation. The decision not to include the Bowater payments in calculating pension earnings under the Plan was made between June of 1988 and September 1, 1988 (Keniry Depo. pp. 28, 31–33).

(45) During the first six months of 1988, the Qualified Plans Committee never once considered the question of whether to interpret the Plan's definition of Earnings to include stock option payments. The Committee did meet in May, but did not address the issue. Kruer in fact asked management to refer the issue to the Committee. Reid, corporate Director of Human Resources, suggested that the issue should be referred to the Committee, but Kennedy and McVerry refused to do so, saying it could wait (Tr. 203–204, 440–441).

(46) The Plan document provides that the Committee is the exclusive arbiter of all interpretation questions arising under the Plan and that the Committee is responsible for administering the Plan. (PX 1, Sections 15.06, 19.13). By actively considering this issue in June 1988, Rexham's management usurped the role, authority and responsibility of the Committee and controlled the policy decision that the Plan requires the Committee to make. Thomas McVerry, V.P. Finance and a member of the Committee, testified that one of the considerations in his interpretation was the Company's intent which was conveyed to the Committee by Reid in September (Tr. 490, 491).

(47) On August 30, 1988, Soule, through counsel, made a claim for additional benefits based upon the failure of the Plan's administrators to include in his earnings the stock option compensation he received under the referred-to stock option plans. On September 1, 1988, the Committee met and discussed the issue of whether to include these payments in Earnings, but without specifically considering Soule's claim. At that meeting Reid, Keniry, and Faris, each members of the Committee, told Kruer, Rexham's Manager of Employ-

ee Benefits, that they read the definition of "Earnings" as amended to include within earnings payments made for stock options in the Bowater matter (Tr. 214–215). At the November 14, 1988 meeting of the Committee, Faris, after learning of management's opinion concerning the exclusion of the Bowater payments from earnings for pension purposes, decided that the exercise of stock option rights by Soule did not come under the Plan (Tr. 554–557).

(48) No decision was reached on the issue at the September 1 meeting. Minutes were prepared indicating that Scott Lea told the committee that there was no "intent" to include these payments. (PX 29). Another draft of the minutes indicates that the Committee was unsure what to do and, therefore, referred the matter to the Company for decision (PX 30). Kennedy, acting as a member of Rexham's management, did not attend the September 1 meeting, but did actively participate in the preparation of the minutes of that meeting. He made revisions showing that the Committee had actually "decided" not to include the amounts in Earnings and inserted language indicating that the Committee had discussed the "intent" of the Board, a suggestion he had received from Rexham's New York counsel, Mr. Richard Alperin of the firm of Sullivan & Cromwell (PX 30).

(49) On September 27, 1988, Kennedy responded to Soule's claim letter of August 30. He indicated that Rexham—the Plan Sponsor—not the Committee—had decided to reject the contentions Soule made in his claim. As of the time of this letter, the Committee had made no decision with respect to the issue. Kennedy, on September 27th, responding to the claim by Soule's attorney, filed on August 30th, rejected Soule's claim because management did not feel it was the Board's intent to include the options in pension earnings (Tr. 602).

(50) Soule filed this action on October 11, 1988, naming Rexham and the Plan as Defendants. Not until November 14, 1988—after both Defendants had obtained an extension of time in which to answer—did the Committee meet to consider this issue. The Plan clearly specifies that the Commit-

tee must act within 30 days of receiving the claim. In this case, it did not.

(51) For about an hour prior to the November 14 meeting, Mr. Hanna—who had then been retained only by Rexham, not the Plan—addressed the Committee concerning the Committee's obligations under the Plan and under ERISA (Tr. 368). In a 4 to 0 vote, with Reid abstaining, the Committee decided not to include stock option payments in pension earnings. With respect to the cash-out payments, the Committee concluded that they should not be included because such payments were made "under the merger agreement," not "under the Plan." With respect to the other exercise of stock options, the Committee concluded that there was no "compensatory distribution" because the stock options had no ascertainable value at the time they were granted (PX 32).

(52) The Committee, at the time of the November 14 meeting, had Kennedy's May 10, 1988 memo to Lea in front of them and each knew of Lea's prior decision (Tr. 404–405). The Committee did not have or consider Soule's claim when it made its decision, nor did it write Soule explaining the reasons for its decisions, which the Plan requires. In fact, the Committee did not specifically deny Soule's claim. One of the factors the Committee deemed important was Rexham's "interpretation" of the Plan (PX 32). The initial draft of the minutes of the November 14th meeting referred to the sponsor's "interpretation" as one of the factors the Committee deemed important. This was changed to read "intent" rather than "interpretation" (Tr. 399–400).

(53) The Plan which is the subject of this action is significantly over-funded (Tr. 520).

The Court has made findings of fact based on what it considers the most credible testimony. The Court has not attempted to cite all portions of the transcript or exhibits to support its findings, but only so much as may be helpful in support of such findings.

## CONCLUSIONS OF LAW

(1) The Court has jurisdiction over this litigation pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 1132(a)(1)(B).

(2) Venue is proper under 28 U.S.C. § 1391(b) and 29 U.S.C. § 1132(e)(2).

(3) 29 U.S.C. § 1132(a)(1)(B) provides: "A civil action may be brought by a participant or beneficiary to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan."

(4) ERISA provides that a fiduciary or administrator of a qualified pension plan is subject to fiduciary duties, including the duty to "discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and their beneficiaries; and in accordance with the documents and instruments governing the plan." 29 U.S.C. § 1104(a)(1)(A), (D).

(5) 29 U.S.C. § 1133 provides that every employee benefit plan shall:

(1) provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied, setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant, and

(2) afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim.

(6) Rexham is a named fiduciary under the Plan and is also a fiduciary as a result of its active participation in the decision-making in this case. 29 U.S.C. § 1002(21)(A). Rexham is a proper Defendant.

(7) Until the Supreme Court's recent decision in *Firestone Tire & Rubber Co. v. Bruch*, —— U.S. ——, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989), the standard for reviewing a denial of pension benefits was whether the decision was arbitrary and capricious. *See Boyd v. Trustees of the UMW Health & Retirement Funds*, 873 F.2d 57, 59 (4th Cir.1989). In *Firestone*, the Supreme Court held that a denial of pension benefits should be "reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone*, 109 S.Ct. at 956. Relying on principles of trust law, the Supreme Court held that "where the administrator or fiduciary has discretionary authority, an abuse of discretion standard should apply." *Id.*; *see also Boyd*, 873 F.2d at 59 (citing *Firestone*).

Thus, the first question for the Court is whether the Committee's decision in this case should be judged by the abuse of discretion standard, or the *de novo* standard.

In order to make that determination, the Court must first determine whether the decision to deny Plaintiff's claim was made by the Committee, or was in fact made by the sponsor, Rexham.

Section 15.06 of the Plan in this case provides:

The Committee shall ... interpret the Plan and shall determine all questions arising in the administration, interpretation and application of the Plan. Any such determination *by the Committee* (emphasis added) shall be conclusive and binding on all persons.

It would appear that under *Firestone, supra,* if the *Committee* interpreted the Plan, as amended by the 16th Amendment, the standard of review should be whether the Committee's decision was an abuse of discretion. If the Committee did not interpret the Plan, but rather if the Plan was interpreted by Rexham, disregarding the language of Section 15.06 of the Plan, then the interpretation was not by the Committee, and the standard of review should be *de novo*.

The Court has made Findings of Fact that Rexham's management (1) had a series of meetings concerning the issue of whether "Earnings" as defined in the Plan included the Stock Option Plans in dispute, (2) learned the projected cost if such Stock Option Plans were included, (3) discussed the issue in *management* meetings, (4) sought Bowater's views, (5) sought the opinion of the Company's counsel, and (6)

after discussion with Bowater's president directed Rexham's manager of Employee Benefits to *exclude* Bowater's "cash-out" payments to Plaintiff in determining his "Earnings" for pension purposes. In addition, the Court has found that Lea, President of Rexham, told Reid, Director of Human Resources, that the decision was not to include the stock option payments in pension earnings, and Reid, in turn, sent a memo to Kruer, Rexham's manager of Employee Benefits, telling her that Lea's decision was to exclude Bowater's payments from benefits. In spite of Kruer's request to management to refer the issue to the Committee, and Reid's suggestion that such action be taken, Kennedy, V.P. Law, or McVerry, V.P. Finance, refused to do so. (Tr. pp. 203–204). Then, after Soule made his claim through counsel for additional benefits dated August 30, 1988, Kennedy, the Company counsel, responded to Plaintiff on September 27, 1988 stating that *Rexham,* (not the Committee), had decided to reject Plaintiff's claim (f.f. 49). Finally on November 14, 1988, the Committee met and by a 4 to 0 vote, with one abstention, decided not to include stock options in pension earnings. Plaintiff's claim was never specifically denied by the Committee. In view of these Findings of Fact it would appear that Rexham, not the Committee, made the decision.

29 U.S.C. § 1002(21)(A)(i) provides in pertinent part:

> ... a person is a fiduciary with respect to a plan to the extent he exercises any discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets....

Thus, since the Company, not the Committee, apparently made the ultimate decision in this instance it would appear that the Committee was not acting as a fiduciary under the definition in the Plan and did not in fact exercise any discretionary authority or control in this instance. "... when trustees are in existence, and capable of acting, a court of equity will not interfere to control them in the *exercise* (emphasis added) of a *discretion vested in them by the instrument* (emphasis in original)

under which they act.' " *Firestone,* 109 S.Ct. at 954, (quoting *Nichols v. Eaton,* 91 U.S. 716, 724–725, 23 L.Ed. 254 (1875) (emphasis added by the Court)).

At the November 14, 1988 meeting of the Committee, (DX 33) attended by all the members of the Committee three issues were presented to the Committee:

(1) Does the taxable income measured by the spread between the exercise price and the fair market value on the date of exercise constitute "earnings" under the Salaried Pension Plan?

(2) Does the taxable gain measured by the spread between the exercise price and the ultimate selling price of the stock constitute "earnings" under the Plan?

(3) Does the cash payment made to option holders pursuant to the merger agreement between Rexham and Bowater constitute "earnings" under the Plan?

(DX 33).

A vote was taken on each item, 1 through 3, as to whether it should be included in the definition of "earnings" and the results were as follows:

| Item Number | Yes | No | Abstain |
|:---:|:---:|:---:|:---:|
| 1 | 0 | 4 | 1 |
| 2 | 0 | 4 | 1 |
| 3 | 0 | 4 | 1 |

(DX 33).

> One member of the Committee abstained from voting due to a conflict of interest. This Committee will recommend to the Board that the language in the document be changed to be more specific on what should be included or excluded in "earnings".

Defendants' Exhibit 34 is the minutes of the meeting of the Qualified Plan Committee of November 22, 1988. Those minutes indicate that all the members of the Committee affirmed that their respective votes at the November 14, 1988 meeting of the Committee were made independently without pressure from the Company.

Defendants contend that in order for the Court to determine that the Committee's decision was an abuse of discretion, the

Court would have to disbelieve all of the members of the Committee. That is not necessarily so. The Court does not question the integrity of the Committee members, nor disbelieve the statement by the Committee members that they made their decisions independently and without pressure from the Company.

However, the Court, based on the evidence in this case, is convinced that the Company exercised undue influence and dominated the Committee's decision.

The Committee had repeated intrusions on their deliberations by the opinion of the executives of the Company and the Company's attorneys. The Court agrees that there were no urgent *demands* by the Company, but the Court is of the opinion that the Company made the ultimate decision when, on June 13, 1988, a memo from Reid, director of Human Resources for the Company was sent to Maryanne Kruer, Manager of Employee Benefits stating "I talked to SCL. Decision is to pay benefits *excluding* the Bowater payments." (PX 25). "SCL" was Scott Lea, President of Defendant Rexham Corporation. This and the other numerous communications from Management to members of the Committee undoubtedly had a great influence on the Committee.

It is true that the terms of a written trust are to be interpreted in the light of all the evidence, including the intent of the settlor. However, communications in this case from management were more akin to a directive to the Committee on how the Plan was to be interpreted by the Committee, than the conveyance of the settlor's intent to be considered by the Committee in the light of all the other circumstances. In effect it was management, not the Committee, which interpreted the Plan.

Thus, since the Committee charged with interpreting the Plan has delegated a nondelegable duty to management, the Court will apply the *de novo* standard in interpreting the Plan.

As the Supreme Court stated in *Firestone*, 109 S.Ct. 954:

*Trust principles make a deferential standard of review appropriate when a trustee exercises discretionary powers.* See Restatement (Second) of Trusts § 187 (1959) ("[w]here discretion is conferred upon the trustee with respect to the exercise of a power, *its exercise* is not subject to control by the court except to prevent an abuse by the trustee of his discretion"). *See also* G. Bogert & G. Bogert, Law of Trusts and Trustees § 560, pp. 193–208 (rev. 2d ed. 1980). (Emphasis added).

*De Novo Interpretation*

Turning to the interpretation of the language, the simple words of the Plan which are contested here are "... plus ... other compensatory payments or distributions made under the ... (named Plans) ... received by the Participant during the preceding Plan Year."

As pointed out in Finding of Fact No. 17, the "Stock Option Plans" provided that the Company could reward its executives by giving either or both of two forms of deferred compensation: performance units and/or shares of stock or stock options. Defendants contend that the only payments or distributions, as that term was used in these Plans, were cash payments to participants of the dollar value of vested Performance Units or Performance shares upon completion of the award cycle, and Defendants agree that any such cash payments should be included as benefit earnings in determining Plaintiff's monthly retirement benefits.

Defendants contend, however, that neither the taxable income measured by the spread between the exercise price and the fair market value on the date of exercise, nor the taxable gain measured by the spread between the exercise price and the ultimate selling price of the stock, constitutes payments under the Plan because no cash was transferred from the Stock Option Plan, and were not distributions under the Plan since the Stock Option Plans grant options which by definition have no determinable value when granted.

The Court does not agree.

"Compensation" is defined as "giving an equivalent or substitute of equal value."

*Black's Law Dictionary*, 256 (5th ed. 1979).

"Payment" is defined as "a delivery of money or its equivalent in either specific property or services by one person from whom it is due to another person to whom it is due." *Id.* at 1016.

The "Executive Stock Option and Performance Share Compensation Plan," the "Executive Long–Term Incentive Plan," and the "1987 Executive Long–Term Incentive Plan" all have as their purpose to attract and retain officers and key executives and to provide a competitive and balanced long-term incentive and reward for officers and key executives of Rexham Corporation ... and its subsidiaries through periodic awards of [S]tock Options and [P]erformance [Units]. Stock [O]ptions are designed to reward executives for their contributions to the success of the Corporation *"as reflected in the appreciation in the market price of the Corporation's Common Stock."* (PX 2, (emphasis added); *see also* PX 3, 9).

The language in this Plan makes it clear that stock options are a form of compensation paid by Rexham to Plaintiff and in fact the 16th Amendment defined "Earnings" to include "... compensatory payments or distributions made under ..." the Deferred Compensation Plans which are the subject of this lawsuit.

Further, the Proxy Statement for the Rexham Corporation Annual Meeting of April 15, 1987, (PX 9) refers to the compensation and Benefit Programs included in the 16th Amendment, and on Pages 17 and 18 of that Proxy Statement—in discussion on Federal Income Tax consequences—paragraph 2 refers to compensation income realized by a participant upon the exercise of a non-qualified Stock Option and an incentive stock option, and corresponding tax deductions by the corporation.

Citing *Gallagher v. Chemetron Corporation Retirement Plan et al.*, 618 F.Supp. 1480 (W.D.D.C.Pa.1985), Defendants in their trial brief, state: "The stock option offer (or grant) was the compensatory act by the Corporation," not the amount realized upon its exercise. *Chemetron* is distinguishable from the present case because Gallagher, who was President, and other officers of Chemetron with stock options negotiated a merger and were paid for cancellation of their option agreement. The trustees of the Plan in *Chemetron* determined to exclude the payment of the stock option buy out as part of Gallagher's compensation as defined in that Plan. In *Chemetron* "Compensation" was defined as: "The earnings paid to an employee by his employer for personal services, including bonuses and overtime...." The definition of compensation in *Chemetron* did not include the Stock Option Plans, as the case at bar specifically does, under the definition of "Earnings."

*Sponsor's Intent*

Defendant cites *Firestone*, 109 S.Ct. at 955, for the proposition that the provisions of the instrument as interpreted in light of all the circumstances and admissible evidence of the intention of the settlor with respect to the trust.

In the case at bar, the facts and circumstances do not support an intent by the sponsor Rexham that the stock options should not be included in the Plan's definition of "Earnings" for the purpose of determining Plaintiff's pension until after the issue arose.

The intent of the Board of Directors was not manifested until after the issue arose and certainly not at the time the 16th Amendment was adopted. Intent created after the fact is not a design or determination with which a person acts, or a state of mind existing at the time a person acts. The Board of Directors of the sponsor cannot be heard after the issue has arisen to state its intent *nunc pro tunc*.

A trustee must strictly adhere to the terms of the Plan and inform a participant of the reasons for denial of his benefits according to the Plan, not advance an employer's separate determination of his own interests. *Andrew P. Dzinglski v. Weirton Steel Corporation; Retirement Committee of Weirton Steel Corporation Retirement Plan*, 875 F.2d 1075, 1078 (4th Cir.1989) (citing cases).

The Findings of Fact are to the effect that when Plaintiff first learned of the 16th Amendment, he expressed his belief to Bill J. Reid, Rexham's Human Resources Director, and Maryanne Kruer, Rexham's Benefit Manager, that under the 16th Amendment his pension earnings should include the amounts he received from the exercise of his stock option the cash-out payments from Bowater. Both agreed that it should. (F.F. 25). Joseph Keniry, Plaintiff's successor as Treasurer, also agreed. (F.F. 26).

Subsequently, *management* had a series of meetings on the issue, and then had Rexham's benefits consultant and actuary determine the actuarial cost if the stock option payments were included. Then Bowater's views were solicited. Kennedy, V.P. Law, concluded in a memorandum to Lea, which Lea had requested, that although this type of payment was not contemplated when the amendment was adopted, the specific reference to "compensatory payments or distributions made" under the Stock Plan presents a difficult argument against the position that the payments at issue are not properly included in the definition of "Earnings".

There is no evidence that the Committee, Rexham, or anyone ever conveyed to Plaintiff the fact that the inclusion of stock options for the purpose of determining Plaintiff's pension was not "contemplated" by Rexham or the Committee when the 16th Amendment was adopted.

It appears that what happened here was that the drafters of the 16th Amendment used words which would justify Plaintiff's giving those words the meaning which he is contending in this lawsuit that those words mean. The Board of Directors cannot now be heard to contend that it did not intend the words to mean what they say when the Board adopted a resolution at its February 27, 1987 meeting modifying the definition of "Earnings" to include compensatory payments or distributions made under the deferred compensation plans which are included in the 16th Amendment.

Where the parties have attached different meanings to a promise or agreement or a term thereof, it is interpreted in accordance with the meaning attached by one of them if at the time the agreement was made

(a) that party did not know of any different meaning attached by the other, and the other knew the meaning attached by the first party; or

(b) that party had no reason to know of any different meaning attached by the other, and the other had reason to know the meaning attached by the first party.

Except as stated in this Section, neither party is bound by the meaning attached by the other, even though the result may be a failure of mutual assent.

*Restatement (Second) of Contracts,* § 201(2), (3) (1981).

To put it more simply,

the language and acts of a party to a contract are to receive such a construction as at the time he supposed the other party would give to them or such a construction as the other party was fairly justified in giving to them, and he will not at a later time be permitted to give them a different operation in consequence of some mental reservation. 17 Am.Jur.2d *Contracts* § 248, at 641, (1964) (footnotes omitted; citing cases).

Defendant argues:

[T]he intent of Rexham as Plan Sponsor by including "compensatory payments or distributions" was to include payments actually made to employees under the specified Incentive Plans and distributions as that term was used in the specified plans or the agreements made with employees under the plans. Certain of the Incentive Plans provided for the granting of stock options and the payment or distribution of Performance Units or Performance Shares. The only payments or distributions as that term was used in these plans were cash payments to participants of the dollar value of vested Performance Units or Performance Shares upon completion of the award cycle. Any such cash payments should be included as benefit earnings in

determining Plaintiff's monthly retirement benefits.

Under the Company's Stock Option Plans, certain key employees are granted the right to purchase a specified number of shares of Rexham stock at a specified price for a specified period of time. The option price is set at the fair-market-value of the stock at the date of the grant of the option. Once an option is granted to an employee, the employee determines whether and when to exercise the option. The employee also decides whether and when to sell the stock received from the exercise of the option which had previously been granted. Succinctly put, Rexham decides whether and when to grant an option under the State Option Plans but any subsequent exercise of the option and any subsequent sale of the stock received is a matter of discretion on the part of the employee in exercising his contractual rights.

There is no cash transferred by Rexham from the stock option plan. Thus, Defendants argue that since there was no cash transferred from the Stock Plan, there was no "payment" under the Plan, and that there is no "distribution" under the Plan, since the Stock Option Plans grant options which by definition have no determinable value when granted. That is, the parties do not know if the value of the stock is going up or down when the stock option is granted. However, if the value of the stock covered by the Stock Option goes up, the holder can buy the more valuable stock at the option price and, therefore, will have taxable income on the difference, and the Company will have a deduction of the same amount, for tax purposes.

Further, the very purpose of the Plans is "... to provide a competitive and balanced long-term incentive and reward for officers and key executives of Rexham Corporation ... and the subsidiaries of Stock Options and performance units." (PX 2, 3).

Defendants have used words which, when defined, mean exactly what they say.

"Reward" is defined as "recompense," *Black's Law Dictionary* 1188 (5th ed. 1979), and as "something that is given for some service." *Webster's New Collegiate Dictionary* 993 (1977).

"Recompense" is defined as to "give something to by way of compensation." *Id.* at 965.

In summary, Defendant Rexham wants this Court to construe the plain language of the 16th Amendment to mean something other than what it says, disregarding Rexham's own Proxy Statement referring to the non-qualified Stock Option and incentive Stock Options as "compensation income." (PX 9, pp. 17–18).

 If the drafters of the 16th Amendment did not wish to include Stock Options, they could have very simply said so by placing an exception at the end of such amendment. The Court will not do it for them. The judicial role is not to rewrite plan provisions, but to assure that they are fairly administered. *Dzinglski*, 875 F.2d 1075.

The plain fact of the matter is that the drafters of the amendment did not consider the meaning of the language used in the amendment until after the issue arose and that is too late.

The Court concludes on this record that Defendants were in error procedurally and in their interpretation of the 16th Amendment to the Plan.

Any Finding of Fact which is determined to be a Conclusion of Law is so deemed, and any Conclusion of Law which is determined also to be a Finding of Fact is so deemed.

*Costs*

 Plaintiff contends that he is entitled to costs including attorney's fees in an amount to be determined by the Court, citing the five factors set out in 29 U.S.C. § 1132(g).

Plaintiff cites five factors which he contends, on proper consideration, would invariably lead to the conclusion that a prevailing plan participant should recover attorney's fees.

29 U.S.C. § 1132(g) states that in any action under ERISA, "the court, in its dis-

cretion, may allow a reasonable attorney's fees and costs of action to either party."

The statute clearly states that fee awards under ERISA are matters within the sound discretion of the courts. *E.g., Davidson v. Cook*, 567 F.Supp. 225, 243 (E.D.Va.1983).

Federal judges have developed a five-part test to assist them in exercising their discretion when determining whether it is appropriate to make a fee award to a party in an ERISA case; the courts usually consider the following factors:

(1) the degree of the opposing parties' culpability or bad faith;

(2) the ability of the opposing parties to satisfy an award of attorneys' fees;

(3) whether an award of attorneys' fees against the opposing parties would deter other persons acting under similar circumstances;

(4) whether the parties requesting attorneys' fees sought to benefit all participants and beneficiaries of an ERISA plan or to resolve a significant legal question regarding ERISA itself; and

(5) the relative merits of the parties' positions.

*Davidson v. Cook*, 567 F.Supp. at 242 & n. 33 (following *Iron Workers Local # 272 v. Bowen*, 624 F.2d 1255, 1266 (5th Cir.1980)); *Dameron v. Sinai Hosp. of Baltimore, Inc.*, 644 F.Supp. 551, 552–553 (D.Md.1986). "No one of these factors is necessarily decisive, and some may not be apropos in a given case. In particular types of ERISA cases, other factors may be relevant as well." *Id.*

This Court has considered all of these factors, and though usually reluctant to award costs and attorney's fees in most cases, it would appear that this is a case where the Court should, in its discretion, award attorney's fees to Plaintiff. The Court does not believe there was any bad faith on the part of Defendants who were trying to defend a position brought about by the failure of the drafters of the language of the 16th Amendment to inform fully the Board of Rexham of the ramifications of the language used.

However, the cost of this litigation will undoubtedly be considerable, and although Plaintiff will receive additional pension benefits if this Court's decision is affirmed on appeal, some of the witnesses for Defendants will also receive additional benefits, and in some cases a great deal more than this Plaintiff. It would be incongruous if those persons were to be awarded additional benefits at Plaintiff's expense.

There is also the consideration, although not a determining factor, that the ability of Defendants to satisfy an award of attorney's fees is certainly greater than Plaintiff's.

Obviously, the relative merits of the parties' position favors Plaintiff, although Defendants' positions do have merit.

The Court will award Plaintiff reasonable costs, including attorney's fees, as may be determined by the Court on the submission of the proper affidavits by Plaintiff, and after consideration of any response Defendants wish to make.

The Court will file a Judgment simultaneously with this Memorandum of Decision.

## JUDGMENT

In accordance with the Memorandum of Decision in this matter filed simultaneously with this Judgment,

IT IS ORDERED, ADJUDGED, AND DECREED:

(1) That Plaintiff have and recover the sum of TWO HUNDRED FOURTEEN THOUSAND SIX HUNDRED SIXTY-SIX AND 18/100 ($214,666.18) DOLLARS, plus interest from the date this Judgment is filed at the rate of 8.16% per annum until paid.

(2) That Defendants shall pay the costs, including Plaintiff's attorney's fees in such amount as may be determined by the Court.