**Wayne R. GRIES, Plaintiff,**

v.

**ZIMMER, INC., Defendant.**

**Michael J. MORAN, Plaintiff,**

v.

**ZIMMER, INC., Defendant.**

**No. C–C–87–576, C–C–87–577–P.**

United States District Court,
W.D. North Carolina,
Charlotte Division.

May 21, 1992.

As Amended May 27, 1992.

---

Louis L. Lesesne, Jr., Gillespie Lesesne & Connette, Richard A. Vinroot, Robinson Bradshaw & Hinson, Charlotte, N.C., for plaintiffs.

Martin N. Erwin, Julie C. Theall, Smith Helms Mulliss & Moore, Greensboro, N.C., for defendant.

## MEMORANDUM OF DECISION AND ORDER

ROBERT D. POTTER, District Judge.

THIS MATTER is before the Court on Motion of the Plaintiffs for Equitable Relief and Attorneys' Fees.

The procedural background and a summary of the evidence in the trial of this case appears at 742 F.Supp. 1309 (W.D.N.C.1990).

On appeal the Fourth Circuit Court of Appeals in unpublished opinion No. 90–2430 determined that this Court's grant of Defendant's Motion for Judgment Notwithstanding the Verdict was improper and the conditional grant of Defendant's Motion for a New Trial was an abuse of discretion 940 F.2d 652. (table) The Fourth Circuit affirmed this Court's denial of Plaintiffs' Motion for a Judgment Notwithstanding the Verdict, the Plaintiffs' Motion for a New Trial solely on the issue of damages and the Plaintiffs' Motion to Amend Judgment.

The Fourth Circuit also opined that it did not believe equity would be served by reinstatement and that equitable considerations led it to grant prejudgment interest on the damages from April 6, 1987.

FINDINGS OF FACT AS TO WAYNE R. GRIES' MOTION FOR EQUITABLE RELIEF

1. Wayne R. Gries ["Gries"], born July 31, 1946, started his employment with Defendant Zimmer, Inc. ["Zimmer"] on February 1, 1979 at salary of $28,000. This salary increased each year to $66,600 in 1987. [PX 2][1] Zimmer terminated Gries on April 6, 1987.

2. Gries also received bonuses based on whether the division which employed him achieved over 75% of its budgeted earnings goal. The normal bonus for Gries was $13,320. This bonus was based on his grade and division earnings of 98.0% to 99.9% of its budgeted earnings goal. Thus, the bonus for Gries would vary according to the percentage of company earnings achievement shown in PX 3. [Tr. 11, 12][2]

3. During the years of his employment at Zimmer, 1979 to 1987, Gries received a bonus in each year, except 1985, which was not less than 100% based on the performance incentive payout shown on PX 3. [Tr. 12, 13]

4. During the time Gries was employed by the Defendant, it had a savings plan. Pursuant to this plan, the company would match the employee's contribution at $.50 on the dollar up to the first 6% of the employee's salary. The employee could contribute an additional 10% of his salary up to 16%, but the company would not match the additional 10% paid by the employee. [Tr. 13]

5. The company's contribution increased in January of 1990. [Tr. 14]

6. An employee could choose several options for investment of monies contributed to the savings plan. Gries chose the fixed income plan. [Tr. 16, 17]

7. The company also had a retirement plan. Gries was vested under the plan and at age 65 will receive a pension of $9,849 a year. [Tr. 18, 19]

8. Subsequent to his discharge Gries attempted to obtain employment comparable to his Zimmer employment. [PX 8; Tr. 21]

## ARC CORPORATION

9. His first employment with the ARC corporation began in December 1987, but was for a limited term of employment ending in September of 1988. [Tr. 21, 22] Gries' salary was $55,000, without the pension or savings plan he had at Zimmer.

## PELTON & CRANE

10. In November of 1988, Gries went to work at Pelton & Crane as a controller, at a starting salary of $52,000. He received a raise in October of 1989 in the amount of $10,000 and a one percent increase each quarter thereafter through the third quarter of 1990. In October of 1990 Gries received a $1950.00 increase bringing his salary to $66,534.00 [Tr. 22, 23] Pelton & Crane is owned by Siemens Corporation, a German corporation. [Tr. 23]

11. Pelton & Crane also had a bonus plan, a savings plan similar to Zimmer's, and a pension plan. [Tr. 24, 26]

12. Gries' total compensation in 1990 was $69,555.00. [PX 9, p. 1]

13. Beginning at age 65, Gries will also receive a pension of $820.79 per month from Pelton & Crane. [Tr. 37]

14. Gries testified on direct examination that he left Pelton & Crane voluntarily. [Tr. 24]. Gries resigned in June of 1991. [Tr. 36]

15. From January 1991 to his resignation on June 21, 1991, Gries received total direct compensation of $33,267.00. [PX 9, p. 2]

16. Cross-examination revealed that at Pelton & Crane, Gries received a 16% bonus on the one occasion on which he was eligible for a bonus. That is, in November of 1990 for the fiscal year ending September 30, 1990. [Tr. 35, 36]

17. Cross-examination also revealed that while at Pelton & Crane, Gries com-

---

1. PX refers to Plaintiffs' Exhibit. DX refers to Defendant's Exhibit.

2. Tr. refers to Transcript.

plained about his failure to receive, in April of 1991, the job of Vice President of Finance. Rather than Gries, a Mr. Dobrowalski was named to that job; Gries considered himself better qualified than Dobrowalski. Gries sent a handwritten note to his superiors and complained to the President of the company that Pelton & Crane was discriminating on the basis of national origin because he thought "they were sending in too many German nationals." [Tr. 37, 38, 39] Gries also complained about Mr. Dobrowalski's predecessor, Mr. Wolfgang Senne because "... he was brought in and I wasn't given the position after the President of the company got rid of the American Vice President of Finance." [Tr. 40]

18. Gries had a running battle with Mr. Senne. [Tr. 40, 41] Gries complained to Senne about his evaluation by Senne and sent a copy of the letter to Gary Ross, the President of the company and to Rodney Wills, the Vice President of Personnel. [Tr. 41, 42].

19. Gries complained about Mr. Dobrowalski to Mr. Werner Maly, and to Mary Sutton, stating that Dobrowalski didn't understand the problems of putting in a new computer system. Dobrowalski confronted him with the note. [Tr. 42, 43] Gries took a vacation and then resigned. [Tr. 43]

### FINDINGS OF FACT AS TO MICHAEL J. MORAN'S MOTION FOR EQUITABLE RELIEF

20. Michael J. Moran ["Moran"] was born August 17, 1942 and first became employed by Zimmer in September of 1975. Zimmer terminated Moran in April of 1987. [Tr. 48]

21. Moran's base salary without bonuses for the period 1975 through termination is set out in PX 1.

22. During the twelve year period Moran was at Zimmer, his average salary increase was 10.7%. Between 1981 and 1987, his average increase was in excess of 9%. His benefits at Zimmer functioned the same way as they did for Gries. [Tr. 49, 50]

23. In his last year with Zimmer Moran's base salary was $76,600. His total salary, including bonus, would have been $96,542.00. [Tr. 50, 51]

### CREATION WINDOWS OF GEORGIA

24. In August of 1987, Creation Windows of Georgia at Athens, Georgia, hired Moran as General Manager at an annual salary of $75,000.00. [Tr. 55]

25. Moran was with Creation Windows until October of 1988. [Tr. 55]

26. On direct examination Moran testified that the job at Creation Windows "... had health and it had some bonus, but not of the nature that we had at Zimmer and had no pension and I think that would be about it." [Tr. 55]

27. On direct examination Moran testified as follows in response to the question of why the job at Creation Windows terminated:

A. When I first went to Creation Windows of Georgia, they were a company owned by an English firm. There was [sic] 7 locations of Creation Windows of Georgia. They were losing money in the majority of their locations. Creation Windows subsequently during the time that I was there we closed down 4 locations, 2 of which we absorbed in the Georgia facility. In 1988, the president of the company felt that he had to reduce his overhead even further. So he just assimilated general management of Georgia from Indiana. He took that job himself. He just continued to act as General Manager for Georgia from Elkhart. He would go down and assume that role. As I understand now, the company is also planning to shut the Georgia operation. [Tr. 56]

28. Robert Hotovy was President of Creation Windows during the time Moran served as General Manager for Creation Windows of Georgia. [Tr. 77, 112]

29. On cross-examination Moran again testified that the President of Creation Windows took over Moran's job of managing the Georgia operation. [Tr. 77]

30. Moran also testified on cross-examination that he had no difficulties with management nor with Hotovy. Moran also testified on cross-examination that Hotovy did not ask for his resignation, that Hotovy was going to eliminate the job and that Moran was not asked to resign because of performance difficulties. [Tr. 77, 78]

31. Hotovy testified that during Moran's employment with Creation Windows his salary was $75,000.00 a year, that Moran had a bonus available to him, and that in 1988 the bonus would have been a percentage of salary based on reaching an agreed profit level. According to this plan, if the company reached the agreed profit level, the bonus would be 30% of salary and that 25% more than that Moran could have received a maximum of 60% of his salary in 1988. [Tr. 113, 114]

32. Hotovy testified that he fired Moran because Moran did not live up to what Creation Windows expected from a manager paid as much as Moran was paid. [TR. 114] In Hotovy's words:

A. When Mike was recommended to us, he was recommended as someone that was a good operations manager, would be able to help us turn the plant around that was in trouble and get it profitable again. When I talked to him in the beginning, he came with all the stories about all the Japanese production methods, just in time and all the things that could happen over a period of that year and none of those things came to fruition. The plant when he started was clean and organized. And over that 13, 15 month period whatever he worked for us, the place got dirtier each month. It was an absolute mess. I was ashamed to take anybody there. He was abrasive with our customers to the point that we were losing customers and I never talked with customers so much yet as I had to talk to them resolving problems that he had caused with the customers. [Tr. 114, 115]

33. Hotovy testified that Moran was not terminated because Hotovy was interested in taking more overhead out of Creation Windows, and that the only reason Hotovy took over Moran's job was he had to in the short term, not to get rid of overhead. "The guy [Moran] could not do the job." [Tr. 116]

34. Moran took over from an individual who was earning $100,000.00 a year and Moran could have earned that much or more. [Tr. 116]

35. Moran was replaced by an employee making $60,000 a year. Hotovy explained that the reason was Moran's replacement did not have the background that Hotovy was told Moran had. Hotovy further testified that Moran was supposed to be a manager even though he did not have any background in windows. [Tr. 120, 121]

### PROCESS ENGINEERING OR PROCESS ELECTRONICS

36. Moran was next employed in January of 1989 by Process Engineering or Process Electronics ["Process"] at a salary of $60,000 a year. Moran served as Vice President of Manufacturing. There were no benefits except health insurance. That job lasted until early 1990 when the company decided to discontinue certain manufacturing operations. [Tr. 57, 58]

37. Moran testified that, after leaving Process, he continued to seek work, but could not find any. He then invested in "Home Medical," a medical rental business, or medical supply business, in Monroe, North Carolina, and has been operating that since 1990. He is Vice President and his wife is President. [Tr. 63, 64].

38. Moran had a loss in that business in 1990 and earned $45,500.00 in 1991. [Tr. 65, 66] He projected $55,000.00 in earnings in 1992 and $63,000.00 in 1993. [Tr. 66]

### CONCLUSIONS OF LAW

Before reaching the question as to what amounts of front pay the Plaintiffs are entitled to receive, it will be necessary to determine *if* they are entitled to receive *any* front pay.

Title 29, Section 626 of the U.S. Code provides in pertinent part as follows:

> ... In any action brought to enforce this chapter the court shall have jurisdiction to grant such legal or equitable relief as may be appropriate to effectuate the purposes of this chapter, including without limitation judgments compelling employment, reinstatement or promotion, ...

In remanding these consolidated cases the Fourth Circuit Court of Appeals stated:

> Reinstatement and prejudgment interest are issues committed to the discretion of the courts. *See Duke* [*v. Uniroyal Inc.*], 928 F.2d [1413] at 1423–25 [4th Cir.1991] (reinstatement); *MacDissi v. Valmont Industries, Inc.*, 856 F.2d 1054, 1061 (8th Cir.1988) (prejudgment interest); *Spagnuolo v. Whirlpool Corp.*, 717 F.2d 114, 120 (4th Cir.1983) (reinstatement); *EEOC v. Liggett & Myers, Inc.*, 690 F.2d 1072, 1075 (4th Cir.1982) (prejudgment interest). The *Duke* court stated that, "notwithstanding the desirability of reinstatement, intervening historical circumstances can make it impossible or inappropriate." 928 F.2d at 1423. We find such circumstances present here. For example, although prolonged litigation may not always render reinstatement not feasible, in this case, the "animosity between the parties" that the litigation appears to have created makes reinstatement inadvisable. *Id.* We do not believe that equity would be served by reinstatement.
>
> However, "[i]n an ADEA case, prejudgment interest is designed to compensate the plaintiff for loss of the use of money wrongfully withheld through an unlawful discharge." *Reichman v. Bonsignore, Brignati & Mazzotta P.C.*, 818 F.2d 278, 281 (2nd Cir.1987). Equitable considerations lead us to grant prejudgment interest on the damage awards from April 6, 1987. *Gries v. Zimmer, Inc.*, unpublished opinion No. 90–2430 (4th Cir.1991) at 22, 23 [940 F.2d 652 (table)].

This Court, having tried the case and observed the parties, also finds that the evidence of the contumacious demeanor of the Plaintiffs toward the Defendant employer, as well as subsequent employers by whom they were employed after termination by the Defendant, is such that reinstatement would be inadvisable. This was demonstrated again by the evidence of the Plaintiff Gries' actions while employed by Pelton & Crane, and by the testimony of the President of Creation Windows where the Plaintiff Moran was employed. [Findings of Facts 17, 18, 19, 32, and 33]

■ Thus, although reinstatement is usually the preferred remedy for an age discrimination plaintiff, when reinstatement is infeasible or inappropriate, front pay may be appropriate to make plaintiff whole. *McNeil v. Economics Laboratory, Inc.*, 800 F.2d 111 (7th Cir.1986), *cert. denied*, 481 U.S. 1041, 107 S.Ct. 1983, 95 L.Ed.2d 823 (1987). The Fourth Circuit has joined other circuits in concluding that if reinstatement is not appropriate, front pay is an available remedy. *Duke v. Uniroyal, Inc.*, 928 F.2d 1413, 1423 (4th Cir.1991). In *Duke*, the Fourth Circuit also determined that the award of front pay is an equitable remedy and that its award and amount is a question for the court sitting in equity to consider and not the jury. Accordingly, in obedience to the Fourth Circuit's decision, this Court sitting in equity held an evidentiary hearing on March 3, 1992 on the issue of front pay.

■ An ADEA plaintiff must attempt to mitigate damages by exercising reasonable care and diligence in seeking reemployment after termination. *Cassino v. Reichhold Chemicals, Inc.*, 817 F.2d 1338, 1345 (9th Cir.1987). Failure to mitigate damages by refusing a substantially equivalent job forecloses any front pay award. *Dominic v. Consolidated Edison Co. of New York, Inc.*, 822 F.2d 1249, 1258 (2nd Cir.1987).

■ In this case, Zimmer fired both Plaintiffs on April 6, 1987. In December of 1987 Gries obtained employment with ARC Corporation at an annual salary of $55,-000.00. That job continued through September of 1988. [Finding of Fact 9] In November of 1988 Gries obtained a job with Pelton & Crane as controller at a salary of $52,000.00. He received a raise in

October of 1989 in the amount of $10,-000.00 and a 1% increase each quarter thereafter through the third quarter of 1990. In October of 1990 Gries received a $1950.00 increase bringing his salary to $66,534.00. [Finding of Fact 10] For 1990, Gries received total compensation of $69,-555.00. [Finding of Fact 12]. From January 1991 until he resigned under pressure on June 21, 1991 his compensation was $33,267.00 [Finding of Fact 14, 17, 18, 19]. On January 19, 1990, the jury awarded Gries $55,851.00. The jury's verdict was for the Plaintiff Gries' loss from April 6, 1987 through January 19, 1990, a period of thirty-four months, or approaching three years after discharge.

As to Moran, he also obtained employment from August of 1987 to October 1988 when he was fired because "the guy could not do the job." [Finding of Fact 33]. According to the evidence, if Moran had not insisted on being abrasive with customers and had performed his duties he could have earned $100,000.00 a year or more at Creative Windows. [Finding of Fact 32, 34]. Thus, the loss of his position there was caused by his own ineffectiveness and explosive personality. On January 19, 1990, the jury awarded Moran $40,540.44 for the period April 1, 1987 until the date of the verdict.

The jury awarded both Moran and Gries exactly, to the penny, one half of the amount sought. At trial the Court instructed the jury on mitigation of damages, and the jury arrived at an award for the period April 1987 to January 1990. The Fourth Circuit in its opinion reversing the conditional grant of a new trial by this Court stated:

... Damages, in view of the comments [by the Court] about mitigation, were not clearly inadequate. *Zimmer* at 21.

Both Plaintiffs had obtained jobs shortly after their termination which were equivalent to the jobs they had with the Defendant. At Zimmer, Gries was Vice President of Finance and Moran was Vice President of Operations. [See 4th Cir. unpublished opinion]. According to the evidence both Plaintiffs in their employment after

Zimmer could have in a relatively short time exceeded the income they were receiving when terminated by Zimmer. However, the evidence at the evidentiary hearing demonstrated that each chose to maintain the same attitude and personality traits that had served them so poorly at Zimmer. As such, and not surprisingly, neither was able to take advantage of the income opportunities offered by their new employers. [Finding of Fact 17, 18, 19, 32, 33, 34, 35]

Both Plaintiffs have been compensated by the jury for the loss they suffered from April 6, 1987 until the jury award on January 19, 1990. Any further award would be an unjustified reward and windfall to two Plaintiffs who were unwilling to control their tempers in order to maintain their positions. The Defendant should not be penalized for their shortcomings. The Plaintiffs have failed to mitigate any future damages after January 19, 1990, and that failure does not entitle them to a lifetime front pay award.

The purpose of front pay under the ADEA is to ensure that a person who has been discriminated against on the basis of age is made whole, not to guarantee every claimant who cannot mitigate an annuity for the remainder of their working life. *Anastasio v. Schering Corp.*, 838 F.2d 701, 709 (3d Cir.1988).

Both Plaintiffs failed to mitigate their damages by in effect refusing to maintain jobs substantially equivalent to the jobs they held with Zimmer. Even though before the jury verdict on January 10, 1990 they had obtained comparable employment from which they received a good income, they were either unwilling or unable to maintain a code of conduct or control their volatile temperament so as to maintain their employment. Had they done so, their claim to have attempted to mitigate their damages would be justified. In truth, they found comparable work but could not keep it because of their attitudes. [Finding of Fact 9, 10, 11, 12, 13, 15, 16, 17, 18, 19, 24, 25, 31, 32, 33, 34]

The Plaintiffs received a total award of $96,391.54: $55,851.10 for Gries and $40,-

544.44 for Moran. In accordance with the Fourth Circuit's opinion and equitable considerations, the Court will award prejudgment interest on those awards from April 6, 1987 at the rate of 6.04% per annum which was the rate in effect for judgments on that date.

*Attorneys' Fees*

The Plaintiffs have also petitioned for attorneys' fees. The Court does not need to use time and space to cite cases supporting the fact that the Plaintiffs are entitled to reasonable attorneys' fees in this case. Nor did Plaintiffs' attorneys need to research that issue. The only question remaining is what a reasonable fee is in this particular case.

Before commencing its discussion of the application for attorneys' fees, the Court will indicate abbreviations for the attorneys involved and summarize in one location information pertinent to this discussion first for Moran's attorneys and then for Gries' attorneys.

Moran's Attorneys:

| NAME | INITIALS | HOURLY RATE REQUESTED | TOTAL HOURS | TOTAL FEE REQUEST | ADMITTED TO BAR |
|------|----------|----------------------|-------------|-------------------|-----------------|
| Richard A. Vinroot | RAV | $195.00 | 499.7 | $97,441.50 | 1966 |
| Louis A. Bledsoe | LAB | 140.00 | 712.8 | 99,792.00 | 1985 |
| Samuel D. Walker | SDW | 100.00 | 121.9 | 12,190.00 | 1984 |
| John R. Wester | JRW | 195.00 | 16.2 | 3,159.00 | 1972 |
| Dan T. Coenen | DTC | 175.00 | 14.0 | 2,450.00 | 1981 |
| Everett J. Bowman | EJB | 175.00 | 1.3 | 227.50 | 1979 |
| Edward F. Hennessey | EFH | 100.00 | 1.4 | 140.00 | 1988 |
| John B. Orgain | JBO | 110.00 | 1.0 | 110.00 | 1986 |

The total hours requested by Moran's attorneys were 1,368 or approximately 171 working days at eight hours per day for attorneys and 22.7 hours for paralegals. According to the N.C. Bar Association Economic Survey for 1991, the median chargeable hours for each lawyer for the year ended December 31, 1990 is 1,695 hours, or 9.6 months for one attorney.

*Wayne R. Gries*

Mr. Gries had one attorney, Mr. Lesesne ["Lesesne"], admitted to the bar in 1973. His requested hours were 623.75 or 79 working days at $175.00 an hour, for $109,156.25 plus $6,307.44 expenses.

*Discussion of Factors for Fee Determination*

The Plaintiffs in their brief have listed and discussed the twelve factors identified in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717–719 (5th Cir.1974) and argued the application of those factors to this case. The Court will now address those arguments.

To begin with, the Plaintiff Moran has requested fees for eight attorneys with hours charged for each attorney varying from 1 hour to 712.8 hours, and with an hourly rate varying from $100.00 to $195.00 an hour, which together with paralegal time results in a request for fees at lodestar rates of $216,961.50. In addition to this, the Plaintiff Moran requests a 25% contingency enhancement resulting in a total request for $271,201.87 in attorneys' fees plus expenses of $12,692.65 for a grand total of $283,894.52. This requested fee is excessive on its face for this case.

At the outset the Court will not allow the 25% enhancement requested. Plaintiff Moran's attorneys state that their firm has taken the case on a fully contingent basis. Plaintiffs' attorneys jointly would be entitled to a fee of $24,097.88 based on 25% of their recovery. However, the fee arrangement between attorney and client is not determinative of the amount which this Court will allow. *Lyle v. Food Lion, Inc.*, 954 F.2d 984 (4th Cir.1992).

The Fourth Circuit in *Food Lion*, a case involving the Fair Labor Standards Act, held:

Because we understand the Supreme Court's most relevant decisions firmly to have "adopted the lodestar approach as the centerpiece of attorney's fee awards," *Blanchard v. Bergeron*, 489 U.S. 87, 94, 109 S.Ct. 939, 945, 103 L.Ed.2d 67 (1989); *see also Blum v. Stenson*, 465 U.S. 886, 888, 104 S.Ct. 1541, 1543, 79 L.Ed.2d 891 (1984); *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air*, 478 U.S. 546, 565, 106 S.Ct. 3088, 3098, 92 L.Ed.2d 439 (1986) (*Delaware Valley I*), we must conclude that it was an abuse of discretion for the district court here to forgo the lodestar approach and to calculate reasonable attorney's fees by adopting instead the attorney's customary contingent-fee arrangement of 20 percent of the recovery. The Supreme Court has held that "[t]he contingent-fee model, premised on the award to an attorney of an amount representing a percentage of the damages, is ... inappropriate for the determination of fees under § 1988," *Blanchard*, 489 U.S. at 96, 109 S.Ct. at 946, and we are satisfied that this implies that the contingent-fee approach is inappropriate under the FLSA as well. *Food Lion*, 954 F.2d at 988. This Court is satisfied that this admonition applies also to this ADEA case.

The Court will now comment on the twelve *Johnson* factors as applied to this case.

**1. Time and Labor Expended**

**A. *Moran***

The time expended by RAV in preparation for the first trial was approximately 213 hours and by SDW approximately 121.9 hours. For the second trial, the fee application indicates RAV expended approximately 86 hours and LAB expended approximately 115 hours. The Court does not believe that the approximately 121.9 hours spent by SDW for first trial is excessive. However, the fee application indicates that LAB spent approximately 115 hours in preparation for the second trial to January 15, 1990. There appears to be some duplication by LAB of the time spent by SDW.

The Court realizes that when approximately ten months elapsed between the first and second trials an attorney must spend a considerable amount of time reviewing and refreshing himself with the evidence. Even so, in preparation for the second trial, the fee application indicates RAV required 35% of the time preparing for the first trial. The Court will therefore reduce the time charged by LAB for preparation of the second trial by 65% or 75 hours, allowing 40 hours to LAB for preparation for the second trial. The Court realizes that LAB had to familiarize himself with the case. However, the law firm has charged for SDW's time; given this, it seems it would be inequitable to require defendant to pay also for LAB's time to become acquainted with the facts. Therefore, the reduction of 75 hours for LAB seems appropriate.

Moran's attorneys' fee application refers to attorneys' fees in approximately 38 entries totalling approximately 65 hours. The actual preparation of the fee petition, conferences concerning it, and briefs apparently commenced on March 4, 1992 and consumed approximately 21 hours. This would seem to be on the high side, but not completely out of reason. Moran's application for attorneys' fees before March 4, 1992 includes entries which are mingled in with the charges for other matters. For example, on 1/23/90 and 1/30/90, there is an entry for hours as follows:

01/23/90 LAB LEGAL RESEARCH RE: NEW TRIAL MOTION, JNOV MOTION; REINSTATEMENT, FRONT PAY; ATTORNEYS' FEES; PREPARE MOTION RE: JUDGMENT ON VERDICT, JNOV, NEW TRIAL, OTHER POST-TRIAL ISSUES; CONFERENCE WITH VINROOT, JR WESTER, L LESESNE            6.80

01/30/90 LAB CONFERENCE(S) WITH RA VINROOT, JR WESTER AND LL LESESNE RE FEES, POST-TRIAL MOTIONS; PREPARE AND FILE MOTION TO AMEND JUDGMENT, JNOV, NEW TRIAL; RESEARCH RE: ATTORNEY FEES: PREPARE LETTER TO ERWIN RE: ATTORNEY FEES; CALCULATE ATTORNEY FEES            5.50

These are just two examples of numerous entries which do not identify the time

spent on attorneys' fees and the time spent on other matters included in the entry.

Because the burden is on the party seeking the fee award to establish the reasonableness of the hours spent, *Hensley,* [*v. Eckerhart*], 461 U.S. [424] at 437, 103 S.Ct. [1933] at 1941, 76 L.Ed.2d 40 (1983)], where it is necessary for the court to approximate because of counsel's inadequate record-keeping we consider it just so to do in favor of the party contesting the fee award. *Cf. id Spell v. McDaniel,* 852 F.2d 762 at 768 (4th Cir. 1988).

The Court must therefore make an approximate adjustment to disallow those entries which the Court estimates include time spent regarding attorneys' fees. The following time therefore will be disallowed for time charged for application for attorneys' fees:

| DATE | ATTORNEY | HOURS NOT ALLOWED |
|---|---|---|
| 1/22/90 | JRW | .3 |
| 1/22/90 | LAB | 1.7 |
| 1/22/90 | RAV | .8 |
| 1/23/90 | JRW | .6 |
| 1/23/90 | LAB | 3.3 |
| 1/23/90 | RAV | .8 |
| 1/24/90 | EJB | .6 |
| 1/24/90 | JBO | .5 |
| 1/24/90 | JRW | .2 |
| 1/24/90 | LAB | 4.1 |
| 1/25/90 | JRW | .2 |
| 1/25/90 | LAB | 1.5 |
| 1/25/90 | RAV | .7 |
| 1/29/90 | LAB | 1.9 |
| 1/30/90 | JRW | .8 |
| 1/30/90 | LAB | 2.8 |
| 1/31/90 | JBO | .5 |
| 1/31/90 | LAB | .3 |
| 2/1/90 | JRW | .3 |
| 2/1/90 | RAV | .5 |
| 2/16/90 | RAV | .3 |
| 3/14/90 | LAB | .3 |
| 3/15/90 | LAB | .3 |
| 5/22/90 | RAV | .6 |
| 6/8/90 | LAB | 1.0 |
| 6/17/90 | LAB | 1.4 |
| 6/19/90 | LAB | .5 |
| 6/19/90 | RAV | .5 |
| 7/20/90 | RAV | .5 |
| 8/2/91 | LAB | .5 |
| 8/27/91 | LAB | 1.0 |
| 11/12/91 | LAB | 1.8 |
| 3/4/92 | RAV | .5 |
| 3/4/92 | LAB | .5 |
| 3/6/92 | LAB | .2 |
| **TOTAL DISALLOWED** | | **32.3 HOURS** [3] |

3.

| | | |
|---|---|---|
| JRW | 2.4 | |
| RAV | 5.2 | |
| LAB | 23.1 | |

Moran's attorneys have petitioned for payment for approximately 323.3 hours spent in connection with the appeal to the Fourth Circuit.

The three issues raised on appeal were:

1. Did the District Court err in granting Zimmer's Motion for Judgment Notwithstanding the Verdict rendered by the jury in favor of Plaintiffs Gries and Moran?

2. Did the District Court err in conditionally granting Zimmer's Motion for a New Trial in the event this Court overturns the District Court's entry of Judgment Notwithstanding the verdict?

3. Did the District Court err in denying Plaintiffs' Motion to Amend the Judgment to provide for Plaintiffs' reinstatement, to award pre-judgment interest and to adjust the damages awarded by the jury to the amount proven at trial, or, in the alternative, for a New Trial limited solely to the issue of damages?

The Fourth Circuit's unpublished opinion was written in less than 23 pages including the cover page and statement of the facts. This was a straight-forward case as to whether there was sufficient evidence to support the jury's verdict. The District Court did not think so; the Fourth Circuit disagreed. Clearly this was not a complex or novel case. The Court will reduce the 323 hours (approximately 40 working days) sought for appeal matters to 168 hours (approximately 21 working days at 8 hours per day). Thus the Court will deduct 155 hours from RAV's and LAB's combined time, and reduce each attorney's time by one half of the 155 hours (323 − 168 = 155/2 = 77.5)

| | |
|---|---|
| EJB | .6 |
| JBO | 1.0 |
| TOTAL | 32.3 |

2. The Novelty and Difficulty of Questions Raise

The Plaintiffs, in their brief supporting the fee application, contend that the Plaintiffs' claims were problematic because both men were in their early 40s at the time of their discharge. Plaintiffs' counsel contend:

> Although both men were in the protected age category, very few cases from around the country describe successful age discrimination claims for men so young, particularly where the Plaintiffs' replacements were as old as Mr. Harvey and Mr. Franco were here (late 30s). Faced with this serious difficulty, Plaintiffs' counsel successfully advanced a relatively new theory of age discrimination to the jury, relying on the "wage is a proxy for age" line of cases. Because this theory has not yet been given any significant treatment by the Fourth Circuit, Plaintiffs' counsel was forced to rely on case law from other federal courts to support this argument. In addition, Plaintiffs' counsel were required to overcome Zimmer's strenuous reliance on the indisputable facts of Plaintiffs' ages and the attendant theory that the Age Act was not designed to protect these Plaintiffs in these circumstances. Plaintiffs submit that the effective development and use of this theory of recovery was critical to their success and serves as a strong indication that Plaintiffs' requested hourly rates are reasonable. [Plaintiffs' Brief in Support of Petition for Attorney's Fees, pp. 7, 8].

The "wage is a proxy for age" theory has been specifically rejected by this Court. *See Latimore v. University of North Carolina at Charlotte*, 669 F.Supp. 1345 (W.D.N.C.1987), *aff'd*, 856 F.2d 186 (4th Cir.1988); *see also, Wilson v. Popp Yarn Corp.*, 680 F.Supp. 208 (W.D.N.C.1988). The Court does not believe that the development and use of that theory was in any way critical to Plaintiffs' partial success. Therefore, the Court will disallow the 15.7 hours time charged by Moran's counsel for preparing an age/wage argument memorandum.

B. *Gries*

Gries' attorney charged for 623.75 hours. The Court finds that number of hours for two trials, an appeal, equitable relief hearings, and attorney fee petition, to be reasonable.

3. Skill requisite to perform the legal services properly

The level of skill exhibited by Plaintiffs' attorneys was adequate.

4. Preclusion of other employment by the attorney due to acceptance of the case

Obviously an attorney can only do one chore at a time, and thus would obviously be precluded from accepting employment for other cases while pursuing this matter.

5. Customary Fee

*Moran's Attorneys*

*RAV Hourly Rate*

The North Carolina Bar Association Economic Survey [NCBAES] indicates that for an attorney admitted to the Bar in 1966 practicing in a firm of thirty plus members in a city of over 100,000, that the typical hourly rate is $176.00 an hour for 1991. This is 1992. Charlotte is a city of high taxes and consequently high office rents. The Court will therefore adjust the NCBAES rate upward to $185.00 an hour. Consequently RAV's rate must be adjusted downward from $195.00 to $185.00 an hour. As stated before, the NCBAES is a valuable tool in assisting in the setting of fees. However, the city size, the nature of the case, the expense of practicing in Charlotte, the skill required in prosecuting the lawsuit, the overall amount of the billing, the number of attorneys involved with the fee applicant who are assisting him, as well as the other factors in *Georgia Highway*, 488 F.2d 714, all have an impact on the hourly rate. In this case an hourly rate of $185.00 for RAV seems appropriate, certainly in view of the fact that no distinction is made in the hourly rate for trial time versus research time, conference time, and travel time for example.

*LAB Hourly Rate*

LAB was admitted to the Bar in 1985. The NCBAES for 1991 indicates that for an attorney practicing in a city of over 100,000 population and in a firm of over 30 attorneys, the typical hourly rate is $108.00 an hour. Again, as in RAV's case, the Court must consider all the factors enumerated and will reduce LAB's requested rate from $140.00 an hour and raise the typical hourly rate indicated in the NCBAES for a result of $125.00 an hour.

Hourly rates for Moran's remaining attorneys will be reduced as indicated in paragraph 12 based on their experience and tasks performed for this case.

*Gries' Attorney*

As to Gries' attorney, the Court will reduce his hourly rate only slightly from $175.00 an hour to $170.00 an hour. This is in line with the hourly rate this Court assigned the lead attorney for Jordan Graphics in *EEOC v. Jordan Graphics*, C–C–89–137–P (W.D.N.C.1991) (Order entered October 29, 1991), less than six months prior to the time this memorandum is being drafted. The Court does not in any way intend to detract from Mr. Lesesne's ability by this minimal reduction. However, the Court in *Jordan Graphics*, after considering all the other factors entering in to an hourly fee rate, including the N.C. Bar Association Economic Survey, set what it believes to be a maximum hourly rate for an attorney admitted to the bar in 1973 and practicing in Charlotte, North Carolina. The Court is not persuaded this rate should be increased at this point in time.

6. Time Limitation imposed by the client on the circumstances

Contrary to the contention of Plaintiffs' counsel there was not what they term "fast track" briefing, at least not caused by the Court. The fee petition shows that attorneys for the Plaintiffs prepared the complaint on August 5, 1987. The first trial commenced March 6, 1989, and the second trial commenced January 10, 1990, hardly a rocket speed.

7. The amount involved and the results obtained

As pointed out before, the Plaintiff Moran received a jury verdict for $40,540.44 and Gries received a verdict for $53,851.10, both sums exactly to the penny one half of the amount requested by each Plaintiff. Thus, counsel was only 50% effective as far as amount recovered.

8. Experience, reputation and ability of attorneys

The Court has considered this as to all counsel.

9. Undesirability of case

This Court has not seen anything to cause this case to be more or less desirable than any other ADEA case.

10. Nature and Length of professional relationship with client

As far as the Court can tell, this is a "one shot" deal between the attorneys and their respective clients.

11. Whether fee is fixed or contingent

The Court has previously discussed this.

12. Awards in similar cases

*Soule v. Retirement Income Plan for Rexham*, 723 F.Supp. 1138 (W.D.N.C.1989), cited by Plaintiffs, was much more complex than the present litigation. *Green v. Williams* and *Thompson v. Barrett*, cited by Plaintiffs, on their face were tried in a much more expensive locale than Charlotte. There are very few cases which are so similar in facts and law that a fee award can be considered comparable for the case before this Court.

Finally, on 9/5/91 and 9/9/91, RAV has charged a total of .8 of an hour at $195.00 an hour, or $156.00 for discussing the case with a South Bend newspaper. The Court fails to see how this could aid his client and this fee will not be allowed.

The Court will make specific adjustments to Plaintiff Moran's fee charge of $271,-201.87. To summarize, the preliminary determination of the fee for Moran's attor-

neys before a percentage reduction is as follows:

| ATTY. | HOURS REQUESTED | HOURLY RATE REQUESTED | HOURS REDUCED | HOURS REMAIN | RATE ALLOWED | PRELIMINARY FEE |
|---|---|---|---|---|---|---|
| RAV | 499.7 | $195.00 | 83.5 | 416.20 | $185.00 | $ 76,997.00 |
| LAB | 712.8 | $140.00 | 191.3 | 521.50 | $125.00 | 65,187.50 |
| SDW | 121.9 | $100.00 | NONE | 121.90 | $100.00 | 12,190.00 |
| JRW | 16.2 | $195.00 | 2.4 | 13.80 | $175.00 | 2,415.00 |
| DTC | 14.0 | $175.00 | NONE | 14.00 | $135.00 | 1,890.00 |
| EJB | 1.3 | $175.00 | .6 | .7 | $135.00 | 94.50 |
| EFH | 1.4 | $100.00 | NONE | 1.4 | $ 85.00 | 119.00 |
| JBO | 1.0 | $110.00 | 1.0 | NONE | N/A | N/A |
| **TOTAL** | | | | 1,089.50 | | **$158,893.00** |
| Paralegal Charges | | | | | | 1,396.00 |
| **Moran Grand Total (before percentage reduction)** | | | | | | **$160,289.00** |

Perusal of the fee petition for Moran reveals numerous instances of extraordinary costs for conferences among the attorneys for his law firm. It has been noted that Moran's fee petition indicates there were eight attorneys and four paralegals from the same law firm involved at some point in representing Moran. Instances of unreasonable charges are as follows:

| DATE | TIME | ATTY | HOURLY RATE | SERVICE | TOTAL COST AT REQUESTED HOURLY RATE |
|---|---|---|---|---|---|
| 1/22/90 | .5 | JRW | $195.00 | Conference | $ 97.50 |
| | .5 | RAV | $195.00 | Conference | 97.50 |
| | .5 | LAB [4] | $140.00 | Conference | 70.00 |
| | | **Conference Total Cost (.5 hour)** | | | **$265.00** |
| 1/23/90 | 1.2 | JRW | $195.00 | Conference | $234.00 |
| | 1.2 | RAV | $195.00 | Conference | 234.00 |
| | 1.2 | LAB | $168.00 | Conference | 142.80 |

**Total Cost Conference & Document Review (1.2 hours) $636.00**

| DATE | TIME | ATTY | REGULAR HOURLY RATE | SERVICE | TOTAL COST AT REGULAR HOURLY RATE |
|---|---|---|---|---|---|
| 1/24/90 | .4 | JRW | $195.00 | Conference | $ 78.00 |
| | .4 | RAV | $195.00 | Conference | 78.00 |
| | .4 | EJB | $175.00 | Conference | 70.00 |
| | | **Total Conference Cost (.4 hour)** | | | **$226.00** |
| 1/25/90 | .4 | JRW | $195.00 | Conference | $ 78.00 |
| | .4 | RAV | $195.00 | Conference | 78.00 |
| | .4 | LAB | $140.00 | Conference | 56.00 |
| | | **Total Conference Cost (.4 hour)** | | | **$212.00** |
| 1/30/90 | 1.3 | JRW | $195.00 | Conference | $253.50 |
| | 1.3 | RAV | $195.00 | Conference | 253.50 |

4. The Court has allotted .5 to each attorney involved even though more time is charged for each entry since other services appear to be performed by LAB and RAV. The same procedure will be used in the following instances; i.e., the least time charged by any one attorney will be used for all attorneys in the conference.

| DATE | TIME | ATTY | REGULAR HOURLY RATE | SERVICE | TOTAL COST AT REGULAR HOURLY RATE |
|------|------|------|--------------------|---------|-----------------------------------|
| | 1.3 | LAB | $140.00 | Conference | 182.00 |
| **Total Conference Cost (1.3 hours)** | | | | | **$689.00** |

---

Those are a few of the instances in which Moran's attorneys did not exercise billing judgment.

Another example of poor billing judgment by Moran's attorneys is the preparation for the appellate oral argument, travel to and from Baltimore, and argument. For that, LAB charged 47.7 hours between March 17, 1991 and May 9, 1991 and RAV charged 19.5 hours for the same period. That totals 67.2 hours for the two attorneys' oral argument phase. In effect, at the rates requested ($140 for LAB and $195 for RAV) Moran's attorneys are requesting in excess of $10,000.00, just for *preparation for oral argument, argument, and travel time*. It appears Gries' attorney spent approximately 32 hours for the same tasks. This is yet another example of duplicative billing by Moran's attorneys. The briefs, reply briefs, conferences, review of file, reviewing appeal issues, reviewing transcripts, preparation of summary, and other matters billed by both LAB and RAV consumed approximately 255 hours (See Fee Petition pp. 29–37) by Moran's attorneys, mostly by LAB. Charging at LAB's requested rate of $175.00 an hour, this comes to $44,625.00. Adding the preparation for oral argument, oral argument, and travel charges this amounts to $55,000.00 for the appeal by Moran's attorneys. (Total of 323 appeal hours have been previously reduced to 168 hours.)

Moran's attorneys have petitioned for a total of 1,368.3 hours attorney time plus 27.7 hours paralegal time or 1,396 total hours, approximately 175 working days at eight hours a day. Because the hourly charges are intermingled it is impossible to discern the allocation of specific tasks to the time charged. For example, the following entry appears for March 19, 1990:

REVIEW LL LESESNE DRAFT RESPONSE TO ZIMMER'S OPPOSITION BRIEF; TELEPHONE CONFERENCE WITH LL LESESNE RE: BRIEF; CONFERENCE WITH RA VINROOT; PREPARATION OF REPLY BRIEF TO DEFENDANT'S OPPOSITION BRIEF RE MOTION TO AMEND JUDGMENT 4.40

In Moran's case, eight attorneys were involved with five different hourly billing rates and charges for several tasks were intermingled. The Court has examined all the hourly billing entries and finds that there are many more inequities and faulty billing judgments than have been discussed here.

In order to arrive at a reasonable fee, the Court will reduce the preliminary fee for Moran's attorneys by an additional 20% or $32,057.80 for a final net fee of $128,231.20 ($160,289.00 − $32,057.80 = $128,231.20). The Court is well aware that the initial contact with the client was five years ago, and that Gries' attorney may have relied on Moran's attorneys for some of the time consuming work that a large firm has the resources to provide. The Court also must consider that Gries' attorney billed for less than one-half the hours Moran's attorneys billed. Further, Mr. Lesesne undoubtedly also assisted Moran's attorneys.

The total attorneys' fees to be allowed Moran's and Gries' attorneys are $234,-268.70. This amount is more than adequate for an ADEA case which, contrary to the attorneys' contentions, was not any more complex than any other ADEA case. The Moran attorneys had sought $271,-201.87 for attorneys' fees and paralegal expenses. Gries' attorney had sought $136,445.31. Thus the total attorneys' fees and paralegal fees sought are $407,647.18. In addition, the attorneys for both Plaintiffs seek expenses of $19,000.09 ($12,-

692.65 for Moran and $6,307.44 for Gries). The attorneys' fees and expenses sought in this case, $426,647.27, thus approaches one-half million dollars.

This is a gross abuse of the process. This Court's observations in *Starnes v. Hill*, 589 F.Supp. 341, 347, 348 (W.D.N.C. 1984) seem appropriate here:

> This matter is to the Court an example of the type of abuses which have resulted in many of the laws passed by Congress which should not have been necessary if those to whom the laws were directed had acted reasonably.
>
> The discrimination which has existed in this country, and still does to some extent, resulted in the revitalization of the Civil Rights Act and the billions of dollars in costs stemming from litigation in that field.
>
> The overzealous labor unions have resulted in labor laws restricting the power of unions.
>
> The unfettered fraud in the Securities Markets resulted in the Securities Act.
>
> The excessive costs in the health industry will eventually result in mandatory controls on hospitals and physicians.
>
> These are just a few of the instances where abuses have resulted and will result in government controls in so many facets of our lives.
>
> The public perception of lawyers now is that those who practice law are gouging the public.
>
> The fees requested here are a small example of an attempt to overcharge, and if fees are not checked by the courts, it will be eventually controlled by Congress. This Court does not want to see regulation of legal fees by politicians.

By reducing the number of hours for the individual attorneys the Court does not intend to imply in any way that the attorneys did not report accurately the time their records reflect they spent on this case. Nor does the Court in any way intend to direct the law firm representing Moran to reduce he number of hours for any attorney named. That is an internal matter to be determined by the law firm. The Court is simply attempting to reduce the time charged to account for duplication of effort and overkill that is apparent throughout the entire fee petition. *Spell v. McDaniel*, 852 F.2d 762, 769 (4th Cir.1988).

NOW, THEREFORE, IT IS ORDERED:

(1) Moran's attorneys shall receive $128,231.20 attorneys' and paralegal fees plus $12,692.65 expenses.

(2) Gries' attorney shall receive $106,037.50 attorney's fees and $6,307.44 expenses.

(3) The Plaintiff Moran shall receive $40,544.44 plus interest at the rate of 6.04% from April 6, 1987 until paid in full discharge of any and all claims against the Defendant arising out of his employment with and discharge by the Defendant.

(4) The Plaintiff Gries will receive the sum of $55,851.10 plus interest at the rate of 6.04% from April 6, 1987 until paid in full discharge of any and all claims against the Defendant arising out of his employment with and discharge by the Defendant.

(5) Court costs to be assessed by the Clerk will be paid by Defendant.